UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

EL PASO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| | § | |
| v. | § | CRIMINAL NO. EP-25-MJ-4025-MAT |
| | § | |
| EDUARDO RENE CAL-CAL | § | |

## MEMORANDUM REGARDING ORDER SETTING SIGNATURE BOND AND DENYING GOVERNMENT'S STAY

On July 30, 2025, the Government filed with the District Court a Motion to Revoke Order Setting Conditions of Release and Stay of Defendant. By way of background, on July 30, 2025, the Defendant entered a plea of guilty as to Count 1 of his information, and was sentenced by the Court. The Court did not accept the plea of guilty on Counts 2 and 3 because of an insufficient factual basis, and severed the remaining two counts pursuant to Federal Rule of Criminal Procedure 14. The Court also obtained the Defendant's waiver of his right to proceed on his case before a District Judge, and the Defendant gave his consent to have his case before this Court. At that time, the Court reopened the detention hearing, and ordered the Defendant released on a $10,000 signature bond. The Government confirmed the existence of an immigration detainer in this case. The Government made an oral motion to stay the Court's bond decision, which the Court denied. For the reasons stated on the record, which it incorporates by reference here, the Court writes to summarize the reasons for its decision.

1

## I. FACTUAL BACKGROUND

Defendant Eduardo Rene Cal-Cal, a citizen of Guatemala, was charged by complaint with entering the United States illegally on July 16, 2025, 1.58 miles west of the Paso Del Norte Port of Entry in El Paso, Texas, in the Western District of Texas. (ECF No. 1.). The place where he entered was not a designated port of entry, and his entry was onto a parcel of the Rio Grande levee recently designated a military property known as the Texas National Defense Area ("NDA"). The NDA is a narrow stretch of land immediately adjacent to the Rio Grande that begins at the American Dam just south of the Texas border with New Mexico, and stretches to the Fort Hancock Port of Entry sixty-three miles away. The complaint states that twelve by eighteen inch signs were posted every one-hundred feet in this area in English and Spanish, warning that this area was a restricted military area. *Id.*

During the factual basis portion of the Rule 11 plea colloquy, the Government stated that a sign was posted on the levee ten yards from where the Defendant entered. The Defendant's entry was shortly before midnight.[1] The Defendant indicated at his hearing that he was arrested immediately upon crossing. While the Defendant readily admitted that he had entered the United States illegally, he said several times during the hearing that he did not know or even suspect he was entering a military property. There was no indication that he gave a statement to any U.S. Border Patrol agent that he was aware he was entering onto a military enclave. Though not necessarily probative to establish the *mens rea* component for either the 50 U.S.C. § 797 or the 18 U.S.C. § 1382 charge, the Defendant testified he did not see any military vehicles or personnel upon his entry, and further testified he did not see any of the NDA warning signs.

---

[1] The factual basis offered by the Government did not note whether this specific sign was lighted or not.

The hearing was conducted in the Defendant's native language, Poqomchi', which is one of a number of Mayan dialects spoken in Guatemala.[2] Upon questioning by the Court, the Defendant stated that he had no more than a third-grade education, but more importantly, that he could not speak Spanish. Perhaps more significantly for purposes of the factual basis, he indicated that he could read only very little Spanish.

The Court concluded that the Defendant was not on notice in any way that he was entering a military property, and thereby rejected the plea of guilty as to Counts 2 and 3. Even if the evidence had shown that the Defendant stopped and attempted to understand or decipher the English/Spanish NDA warning sign thirty feet away from him (it did not), the exchange between the Court and the Defendant in discussing the factual basis for Counts 2 and 3 made it abundantly clear that he was incapable of reading or understanding the sign in the languages posted. The Court articulated on the record why this was insufficient mental intent to sustain a plea of guilty on either of these charges. Without belaboring the point, simply walking onto a military base (and violating a security regulation in doing so) *without knowledge* that the restricted area was a military base does not meet the scienter requirement in any reasonable interpretation of *mens rea* for these two charges. *See, e.g., United States v. Strakoff*, 719 F.2d 1307, 1310 (5th Cir. 1983) (holding that because notice regarding the prohibition of weapons in a federal courthouse was not posted in a conspicuous place *and* "absent any showing that [defendant] did in fact have notice of the proscriptions of [the regulation], [defendant's] conviction cannot stand"). Thus, the Court accepted the plea of guilty only as to Count 1, the illegal entry charge. Noting that the Defendant had no

---

[2] This Court has conducted multiple hearings in the last ten years in many different Mayan dialects, to include Kanjobal, Mam, Chuj, K'eckchi, Ixil, and many others, but it had never encountered Poqomchi'. In discussing this matter with the official court interpreters, it is the Court's understanding that Poqomchi' is a sub-category of the K'eckchi dialect. The Court was informed that there are only two official court interpreters in this language in the United States.

criminal or immigration history, the Court sentenced the Defendant to time served as to Count 1. It severed Counts 2 and 3 and set trial. Based in part on the strength of the Government's case as to Counts 2 and 3, the Court opted to reopen the detention hearing and set a $10,000 personal recognizance or signature bond .

## I. ANALYSIS

The Bail Reform Act presumes that a defendant will be released at his initial appearance, absent a finding that the defendant poses a danger to the community or represents a risk of flight. 18 U.S.C. § 3142(b).  Nothing in the Act requires that the Court detain a defendant who lacks legal status in the United States.  The Act details scenarios in which detention is automatically presumed; a defendant's lack of legal status is not among them. *See, e.g.*, 18 U.S.C. § 3142(e)(2) and (f)(1) (noting that there is a rebuttable presumption for detention for cases involving, for example, crimes of violence punishable by more than ten years, drug offenses where punishment is ten years or more, and felonies involving the use of a firearm).

The Court set a jury trial date for September 15, which is the Court's next-available trial setting. The Court has trials set the weeks of August 11 and 18, is on criminal duty the week of the 24th, and is therefore unable to try this case in August.  The Court would note the September 15 trial setting is dependent on the in-person availability of *both* of the only two Poqomchi' interpreters in the nation, as two interpreters would be required according to the protocols that have been communicated to the Court by the local official court interpreters. The Court recognizes that if it cannot accomplish this significant logistical and scheduling hurdle before mid-September, the Court will have no choice but to reschedule the trial.  The pending 1382 charge is a petty offense punishable by no more than six months in jail. For the 797 charge, which is punishable by up to a year in jail, the United States Sentencing Guidelines under Section 2X5.2 establish a base

4

offense level of six, and a sentencing range of zero to six months for an individual at Criminal History Category I, as the Defendant appears to be.[3] Thus, the best case scheduling scenario (should both interpreters be available to travel to El Paso in September) would be a trial almost two months after the Defendant's arrest, in a case where the Defendant's sentencing exposure is incredibly low.

The Defendant faces prejudice by not being able assert his right to trial expeditiously in a case where, as a practical matter, he faces a maximum of six months in jail. This is compounded in this specific case by what the Court believes are very weak facts presented by the Government to support the allegations in Counts 2 and 3. The Court recognizes that the facts presented by the Government at the plea colloquy would not necessarily be the exact same evidence the Government might marshal at trial. And while the Court completely agrees that strength of the case is one of the least important factors under the Bail Reform Act, it is nevertheless a factor. And it is one that looms large in this case, in this Court's opinion.

The fact that the Defendant will be going from the custody of the U.S. Marshal Service into the custody of another federal government agency does not trigger a risk of flight by the Defendant. It seems unnecessary to say so, but the Government cannot argue the Defendant is a flight risk when it would be the Government creating the risk of flight. It is a virtual certainty that this Defendant will be going to into immigration custody. This is not a situation where the Defendant is likely to be immediately released to the streets. In the unlikely event the immigration services were not to act on their detainer and were to release the Defendant, the Court has indicated

---

[3] This is such a low-level offense that the sentencing range for a Criminal History Category 1 Defendant remains at 0-6 months even if the Defendant receives no adjustments for acceptance of responsibility or for other reasons. And when the Court refers to this offense as a "low-level offense," it is merely describing what Congress and the Sentencing Commission have made clear through their assessment of a very low guideline range for a 797 offense, particularly with regard to a defendant in a Criminal History Category I.

that his placement will be at Dismas Charities, and the Court can always modify the conditions of release to include monitoring and other measures, if necessary. And if the immigration services act on their detainer, the custodial government agency can choose to present the Defendant at trial, put him on a bond, or parole him into the country and transport him back to the United States to stand trial, in the event he was deported. These possibilities are entirely within the purview and discretion of the United States Government. Given this, the Court determined that a personal recognizance bond was appropriate, and that a stay of the Court's bond decision was not warranted under the specific facts of this case.

      **SIGNED** and **ENTERED** this 1st day of August, 2025

_____
**MIGUEL A. TORRES**
**UNITED STATES MAGISTRATE JUDGE**